UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| SEMINOLE WALLS & CEILINGS | ) | Case No.  6:01-bk-01966-KSJ |
| CORP., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| CARLA MUSSELMAN, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 6:04-ap-77 |
| vs. | ) | |
| | ) | |
| DEBBIE JASGUR, | ) | |
| JOSEPH JASGUR, | ) | |
| ROBERT L. FOX, | ) | |
| DARTLIN J. AFRICH, | ) | |
| AFRICH MAINTENANCE, INC., | ) | |
| AFRICH MANAGEMENT & | ) | |
| INVESTMENT, INC., | ) | |
| VINTAGE PARTNERS, INC., | ) | |
| BRADLEY E. WHITTLE, | ) | |
| THE FUNDING SOLUTIONS, INC., | ) | |
| JOSEPH YARON, | ) | |
| PITA CORPORATION, | ) | |
| PAUL PHILIPSON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| CARLA MUSSELMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 6:04-ap-79 |
| vs. | ) | |
| | ) | |
| AFRICH MANAGEMENT & | ) | |
| INVESTMENTS, INC., | ) | |
| AFRICH MAINTENANCE, INC., | ) | |
| DARTLIN J. AFRICH, | ) | |
| ROBERT L. FOX, | ) | |
| PITA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Joseph Jasgur is a very talented photographer who mingled with and photographed Hollywood celebrities starting in the 1940's.  One celebrity he photographed was Norma Jean Mortenson,[1] more popularly known as Marilyn Monroe.  Jasgur apparently took her first professional photographs, including the only photo that suggests she had six toes on one foot.  His collection,[2] however, is much more extensive, includes many Hollywood celebrities from the 1940-1950's, and, by all accounts, is very impressive (the "Jasgur Collection").  During these bankruptcy proceedings, the debtor described the Jasgur Collection as consisting of "Norma Jean a/k/a Marilyn Monroe posters, collector cards, props limited edition photographs as well as the Hollywood Canteen Collection and other Hollywood celebrity photographs and memorabilia." (Doc. No. 221, p. 3-4 in the Main Case).  The reader can get a sense of the magic of these early celebrity photos by looking at some examples introduced during the trial or by looking at Jasgur's personal journal.  (Jasgur Ex. Nos. 15 and 16; Africh Ex. No. 59).

Unfortunately, Mr. Jasgur's marketing and business expertise does not equal his photographic ability.  For decades, Jasgur has tried to capitalize on his work, to largely no avail.  He has associated with many potential purchasers and marketers for his photographs.  One of these potential purchasers, PITA Corporation, is intertwined with the debtor in this Chapter 7 bankruptcy case.

Because of the numerous issues relating to the extent of PITA's interest in the Jasgur Collection, a multi-day trial was held on some, but not all, of the complex issues raised in these adversary proceedings.  The only two issues tried and the only two issues resolved in this

---

[1] Norma Jean married Jimmie Dougherty at age 16.  Therefore, her legal name was Norman Jean Dougherty when Jasgur first photographed her.

[2] The exact contents of Jasgur's collections is not yet defined, because many legal issues, such as intricate intellectual property issues, not tried during this initial litigation phase, may determine the inclusion or exclusion of certain items.  As such, although the Court will refer to the "Jasgur Collection," the exact parameters of that collection are undecided and will be determined later.

Memorandum Opinion relate to (i) whether Jasgur ever effectively transferred any assets to PITA, and (ii) whether the Court should approve a settlement agreement between Jasgur and the Chapter 7 Trustee, Carla Musselman.  All other issues raised in this adversary proceeding will be decided later, to the extent the issues remain relevant.

## Parties and Bifurcated Issues

To start, a description of the parties and their complicated relationships is appropriate. The debtor is Seminole Walls and Ceilings Corporation ("Seminole Walls").  On March 13, 2001, the company initially filed a petition seeking to reorganize its financial affairs under Chapter 11 of the Bankruptcy Code.[3]  Seminole Walls was controlled by Robert Fox,[4] who used the company for varying business purposes.  He ran a drywall business, but he also used the debtor's corporate entity for other diverse ventures, such as investing in fine wine.  Pursuant to the Disclosure Statement filed by Seminole Walls, the debtor also owned PITA,[5] which in turn, claimed an interest in the Jasgur Collection:

> The Debtor currently holds one hundred percent of the stock in PITA Corporation.   This corporation was purchased as an investment vehicle for the Debtor.   Over the years PITA has invested and disposed of various investment properties.  The last purchase was the Jasgur Collection….PITA sold all of its rights to the collection to Vintage Partners, Inc., in exchange for cash and a note in the amount of $1,800,000.00.   The note was due and payable on November 4, 2001.  Citing the poor economy and other legal factors, Vintage Partners, Inc., defaulted on the note.  The Debtor filed suit to collect on the note in the Circuit Court of Orange County Florida against one of the principals of Vintage Partners, Inc., in December of 2001.  Further amendments to the complaint will be forthcoming to add additional defendants and to press for judgment on the note or return of the collateral.  The Debtor is currently in settlement negotiations with Vintage.  When the note is collected or the Jasgur Collection is liquidated, after

---

[3] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

[4] Charles Culverhouse, Donald Bright, and Patti Dooley Culverhouse also were involved in the management of the debtor.  Patti Culverhouse was the President of the debtor in 2002.  However, regardless of titles or positions, the Court would find that Fox ran the debtor as his own personal corporation and was the primary decision maker.

[5] Seminole Walls listed in its schedules that it owned 100 percent of the stock of PITA.

> costs expenses and debts of PITA are paid (PITA has less than
> $700,000 in debt), the net proceeds shall be used by the Debtor
> toward the implementation of the Plan of Reorganization.

(Debtor's Disclosure Statement, Doc. No. 221 in the Main Case, p. 3-4).

PITA, in turn, was to contribute its interest in the Jasgur Collection to pay claims of Seminole Wall's creditors. Specifically, Article VII of the debtor's Plan of Reorganization provided that upon liquidation of the Jasgur Collection "[t]hese net proceeds shall be applied in the following sequential order: first, to the claim in Class 4 until that claim is paid in full; next to Class 6 until paid in full and finally to Class 7 until that claim is paid in full." (Debtor's Third Amended Plan of Reorganization, Doc. No. 221, Exhibit D, pg. 8 in the Main Case).

The debtor eventually confirmed, after several tries, a Third Amended Plan of Reorganization, as further amended (Doc. No. 221 and 244 in the Main Case). The confirmation order was entered on August 21, 2002. (Doc. No. 249 in the Main Case). Because the debtor's earnings were speculative and just marginally enough to pay operating expenses, feasibility of the debtor's ability to perform as required under the plan looked shaky. Moreover, the Court had grave reservations about Fox, his trustworthiness, and his ability to perform upon his promises.

Based on these concerns, the Court specifically retained supervision over the debtor and its finances and provided that no final decree closing the case could enter until after the debtor demonstrated to the satisfaction of the Court that it had substantially consummated its confirmed plan and, in no event, before January 29, 2003. The debtor, in the interim, was required to file monthly financial reports and to timely pay its taxes. More importantly, the debtor knew that the only way the required payments realistically could occur was if PITA's alleged interest in the Jasgur Collection was sold or if PITA collected upon the promissory note due by Vintage Partners, Inc.

Not unexpectedly, the debtor stopped making payments required under its confirmed plan. Creditors started filing motions seeking relief from the automatic stay and to dismiss the

Chapter 11 case due to the debtor's failure to perform (for example, the Motion to Dismiss filed by Hertz Equipment (Doc. No. 285A in the Main Case.); the Motion to Dismiss Case filed by creditor, Vicki B. Whitman (Doc. No. 302 in the Main Case); and the Motion for Relief from Stay filed by creditor, Williams Scotsman, Inc. (Doc. No. 304 in the Main Case)).  Eventually, the United States Trustee filed a Motion to Convert the Case to Chapter 7 (Doc. No. 299 in the Main Case).   In this motion, the UST asserted that the debtor had stopped making all required tax payments, including the payment of employee trust fund withholding taxes, and that the debtor, by its own admission, "has experienced a series of financial reverses that have prevented the debtor from fully consummating the plan of reorganization."[6]  A hearing on the motion was set for April 2, 2003.

The hearing on this motion was dramatic.  Fox entered the courtroom waving a check which, he said, could pay part, but not all, of the amounts then due under the debtor's confirmed plan of reorganization.  The monies were insufficient to stop the conversion, and the case was converted to a Chapter 7 case (Doc. No. 312 in the Main Case).  Carla Musselman was appointed as the Chapter 7 trustee.  Since that day, April 2, 2003, the trustee has sought to collect the assets of the debtor.   One of the primary assets is the bankruptcy estate's interest in the Jasgur Collection.

After some preliminary investigation, the trustee filed two adversary proceedings—Adversary Proceedings 04-77 and 04-79—both seeking to get control of the Jasgur Collection. In the first adversary proceeding, 04-77, the trustee seeks a diverse variety of relief, including, in Count 3, a declaratory judgment that would define the items included in the Jasgur Collection and determine the claims of the various parties who claim ownership in some or all of the Jasgur Collection.   In addition, the trustee in both adversary proceedings seeks the turnover of the

---

[6] The debtor's admission appears in its Motion to Continue the Final Decree Hearing Set for January 29, 2003 (Doc. No. 292 in the Main Case).

Jasgur Collection from the various parties holding parts of the collection as well as determination of various fraudulent transfer claims. Because many people have been promised a part of the Jasgur Collection, the issues raised in these related adversary proceedings are complicated.

However, the trustee's claim of ownership to the Jasgur Collection rests on two primary arguments. First, the trustee's claim to the Jasgur Collection is no greater than the ownership interest of PITA. The trustee can only assert those rights that the debtor, Seminole Walls, had through its alleged subsidiary, PITA. In re Witco, 374 F.3d 1040, 1043 (11th Cir. 2004) (although property of a bankruptcy estate is broadly defined under 11 U.S.C. § 541(a)(1), the trustee can take no greater rights in property than that held by the debtor as of the commencement of the bankruptcy case). Therefore, if PITA has no ownership rights, neither does the trustee.

Second, the trustee may have gained some rights to the Jasgur Collection pursuant to a settlement she entered into with Jasgur (Doc. No. 467 in the Main Case). Jasgur was represented by counsel during the negotiations to finalize the terms of the settlement agreement. The negotiations lasted several months, starting with the trustee's original offer on August 26, 2004, and concluding when Jasgur signed the original version of the settlement agreement on January 14, 2005. (Trustee's Ex. No. 5, Africh Ex. No. 63).

On March 29, 2005, the trustee filed a motion to approve her settlement with Jasgur, contending that the settlement would reduce litigation costs, improve the estate's ability to realize the value of the Jasgur Collection, and remove the uncertainty of Jasgur's claim that he still owned and controlled the Jasgur Collection (Doc. No. 467 in the Main Case). The terms of the settlement are quite simple. The trustee will market and sell the Jasgur Collection, and, after paying any portion due to any other party claiming an interest in the collection, the trustee and Jasgur will split the proceeds with the trustee receiving 65 percent and Jasgur receiving the remaining 35 percent.

Sadly, Jasgur, who now is approximately 87 years old, was deemed incapacitated by a Florida state court on August 10, 2005.  (Jasgur Ex. Nos. 12 and 13).  Jasgur no longer is able to contract, to manage his own property, or to sue and defend lawsuits.  Martin L. Stanonik was appointed a limited guardian of the person and property of Jasgur and is authorized to make those decisions that Jasgur no longer can make.  Stanonik did not testify at trial.  Apparently, Stanonik was an acquaintance of Jasgur, currently lives in Illinois and, at one point, anticipated receiving some interest in the Jasgur Collection.  As early as June 23, 2003, Stanonik acted as Jasgur's Health Care Surrogate and held certain limited legal powers pursuant to a Durable Power of Attorney. (Jasgur Ex. No. 10).  Stanonik also is the primary beneficiary under Jasgur's Last Will and Testament and would inherit the Jasgur Collection, to the extent Jasgur regains control of the assets.  (Trustee's Ex. No. 57).

Jasgur currently resides in a nursing facility that provides him with the medical and physical care he needs, which is substantial.  In the year before the trial, he broke his hip and encountered other serious medical problems.  Jasgur is a very sympathetic character with a flamboyant history but who today is no longer able to care for himself or handle his own finances.  Obviously, he could not testify at trial.

Jasgur's guardian no longer wants to go forward with the settlement agreement between Jasgur and the trustee.  Stanonik has filed a formal objection to the settlement and has filed a separate motion to rescind the compromise (Doc. Nos. 520 and 521 in the Main Case).  Stanonik argues that, as a party to the settlement agreement, he can unilaterally rescind the agreement at any time prior to approval of the bankruptcy court.  Further, Stanonik argues that Jasgur lacked the capacity to sign the settlement in January 2005, and that the agreement was signed under either a mutual or a negligent mistake of fact by the parties.

In addition, Africh Maintenance, Inc. ("Africh"), claims ownership of the Jasgur Collection and has objected to the trustee's settlement with Jasgur.  Like many issues in these

adversary proceedings, those relating to Africh's claims to the Jasgur Collection are complicated. However, for simplicity in this Memorandum Opinion, the Court need only mention that Africh Maintenance, Inc., a company controlled by Dartlin J. Africh, who, in turn, was a social friend of Fox, claims ownership of the Jasgur Collection.[7]  Similar to the trustee's claims, Africh's claims all derive from PITA's alleged ownership interest.

The objection by Africh to the trustee's settlement is based on the argument that the trustee cannot sell the Jasgur Collection because neither she nor Jasgur *own* the Jasgur Collection.  Rather, Africh argues that it is the true owner of the collection.[8]  Africh also argued that it cannot properly frame an objection because it never was able to complete Jasgur's deposition, due to his declining physical and mental health.   Because both the trustee and Africh derive their ownership claims from whatever interest PITA has or held, both the trustee and Africh agree that PITA certainly had a substantial interest in the Jasgur Collection.

Jasgur, through his guardian and attorneys, now denies that PITA ever had a legitimate right to the Jasgur Collection.  In addition, yet another person, Paul E. Philipson, claims an earlier interest in the Jasgur Collection that arose in 1986, long before PITA even arguably acquired any interest in the photographs.  Philipson and Jasgur were business partners in Los Angeles starting in 1986.  The purpose of their business relationship was to market the items in the Jasgur Collection.  The Court will discuss the various agreements between Jasgur and Philipson in more detail later; however, for now, it is enough to relay that certain legal rights in the Jasgur Collection may have been conveyed by Jasgur to Philipson during the 1980's.

Therefore, the ownership claims to the Jasgur Collection divide into those claims that arose *prior* to PITA's claims—those of Jasgur and Philipson—and those that arose *subsequently*

---

[7] For simplicity, the Court will refer to all of the Africh related defendants as "Africh."

[8] In this first phase of the trustee's litigation, the Court will not reach the issue of whether Africh's rights to the Jasgur Collection arose as a result of the fraudulent transfer, as the trustee asserts.

and derive from PITA's interest—those of the trustee and Africh.  The extent of PITA's interest in the Jasgur Collection then is a dividing line.  For that reason, the Court bifurcated the issues raised.  The first portion of the trial addressed only two limited issues.  First, whether PITA ever, through any means, acquired any interest in the Jasgur Collection.[9]  Second, whether the Court should approve the settlement between the trustee and Jasgur.  The resolution of these issues then will dictate whether the trustee ever obtained a legal interest in the Jasgur Collection and whether this Court ever needs to reach the other even more complicated issues raised in the adversary proceedings, such as what items are included in the Jasgur Collection, whether the interest acquired by Africh is avoidable as a fraudulent transfer, and the extent of the interest held by Philipson.

### Philipson's Interest in the Jasgur Collection

Going back to the earliest claim in time, Paul Philipson asserts somewhere between a 50 percent and a 100 percent interest in the Jasgur Collection.  For the first phase of this trial, the Court need only determine whether Philipson has a 100 percent interest in the Jasgur Collection. If he owned the entire collection as early as 1987, Jasgur could not have later conveyed any portion of the collection to PITA. Therefore, the Court is not resolving the extent of any lesser interest Philipson may have in the Jasgur Collection or otherwise resolving any ownership disputes between Philipson and Jasgur.  Rather, the Court's inquiry is limited to addressing whether Philipson held a 100 percent interest in the Jasgur Collection in the late 1980's.  The Court holds that he did not, as explained below.  Jasgur retained a still undefined interest in the Jasgur Collection *after* his business dealings with Philipson went awry.

However, Philipson may indeed have a claim to a portion of the Jasgur Collection. Philipson bases his claims upon (i) a series of three agreements signed by Jasgur in 1986 and

---

[9] The trustee raised this issue in seeking a declaratory judgment in Count 3 of the Second Amended Complaint filed in Adversary Proceeding 04-77.

1987, (ii) a settlement he contends was reached in litigation filed in California, and (iii) formal copyright assignments by Jasgur to Philipson of certain photos in the Jasgur Collection.

In the 1980's, Jasgur still was living in Southern California. Paul Philipson and Jasgur worked for the same telemarketing company starting in 1985. Philipson professed to have marketing expertise that would allow him to sell Jasgur's photos and make huge profits. They decided to go into business together and form a new company called Prime Entertainment, Inc. Jasgur was to act as President and a Director. Philipson was to serve as the Chief Executive Officer and Chair of the Board of Directors. The new corporation was to provide Jasgur with a photo lab and storage facilities for his work while the items were being marketed. Philipson was to attract investors and market the Jasgur Collection. (Philipson Exh. Nos. 7, 8, 9, and 10). Philipson paid all of the corporate expenses and some of Jasgur's personal living expenses.

To accomplish their business goals, the parties signed three separate agreements. All of the agreements were prepared without legal assistance and are difficult to interpret through a legal prism. The first agreement, dated August 28, 1986, titled a Preliminary Agreement on Provisions for Binding Contract, is similar to a Memorandum of Understanding, more of an agreement to agree in the future (the "First Philipson Agreement"). (Philipson Exh. No. 3).

Next, Jasgur and Philipson signed a letter agreement, dated January 22, 1987 (the "Second Philipson Agreement"). (Philipson Exh. No. 2). In this five-page document, the signors set forth more detail regarding their business relationship. Prime Entertainment, Inc. would market Jasgur's work, and Jasgur and Philipson would equally share any profits. Philipson was to be the majority shareholder, holding four shares of the seven total, Jasgur would receive two shares, and a third party (Philipson's then-fiancée), Andrea Slosberg, who was to act as treasurer, would own the remaining share. The Second Philipson Agreement is very informal and, in many ways, reads more like a letter between friends than a business agreement. For example, it contains the following language:

> Joseph Jasgur acknowledges the sincerity [sic] and committment [sic] both he and Paul have toward growing the company and realizes that all monies Paul has previously spent or will spend in the future are in good faith for Joseph's and Paul's mutual success. The money Paul has spent for Joseph's livelihood i.e. rent and any other expenses; exemplifies Paul's high code of ethics and fairness compelling Joseph to trust Paul entirely for every aspect connected to the operation of this business.

(Philipson Exh. No. 2, pp. 2-3).

In connection with the parties' understanding of the ownership of Jasgur's work, the Second Philipson Agreement is particularly difficult to interpret.  One portion provides:

> Joseph is recognized as the full owner of all his property and he is free to dispose of, utilize and control everything except the photograph and negative collections and the Norma Jeane Daughtery [sic] signed releases originals (all three of the releases). These exceptions listed herein are the mutual property of Joseph and Paul and only mutually agreed plans can be put into effect concerning them.

(Philipson Exh. No. 2, p. 3).  This provision implies that Jasgur retains ownership of his work, with a very large exception relating to Jasgur's "photograph and negative collections." However, other language refers to Jasgur's obligation to name Philipson as the sole beneficiary of his assets, including his photos and his interest in Prime Entertainment, Inc., in his will.    Perhaps the parties intended Jasgur to keep title to most of his work, until his death and then, if Philipson was still alive and Prime Entertainment was still operating, to bequeath the interest in his work to Philipson.  Certainly, the Second Philipson Agreement did not require Jasgur to immediately transfer title to *all* of his photos and works, until his death.[10]

Last, the parties signed a third agreement on October 14, 1987 (the "Third Philipson Agreement").  (Philipson Exh. No. 1).  In this agreement, Jasgur agreed that he "has consigned to Philipson half ownership of the entire [Jasgur's photography] collection with the understanding

---

[10] Philipson did introduce a draft will supplied to Jasgur in which Jasgur was to bequeath to Philipson all of Jasgur's "commercial photograph collection, negatives, sound equipment, cameras, laboratory darkroom, books, equipment, television, and current patents and copyrights." (Philipson Ex. No. 4).  The will is not signed.

that both owners will consign all their rights to the corporation to list as assets, this entire collection and all rights ensuing from the collection." The Third Philipson Agreement also states that Prime Entertainment Inc. was the "duly authorized entity who can claim as assets, represent as owner and licensing agent, conduct business with, and formalize contracts" involving the Marilyn Monroe photos. It is hard to interpret this language applying normal legal standards. For example, Jasgur never agrees to transfer any assets, merely to "consign" a 50 percent interest to Philipson who, in turn, was required to "consign" his interest to the corporation. Perhaps the parties were merely attempting to get financing and needed to document that the corporation had the right to transfer and market the photos in question. The Court cannot tell and would find that none of the three Philipson agreements independently conveyed <u>any</u> interest in any aspect of the Jasgur Collection to Philipson. Moreover, Philipson conceded during cross-examination that Jasgur was very protective of the ownership rights to the negatives and original photos. Jasgur's hesitancy to formally transfer ownership of the Jasgur Collection to Prime Entertainment is evidenced in the reticent and confusing language in the three agreements signed by Jasgur and Philipson.

Like much of Jasgur's life, litigation follows him. The business relationship between Jasgur and Philipson soon soured. Eventually, Philipson sued Jasgur in a California state court. Philipson testified that the parties reached a settlement; however, the version introduced during the trial was unsigned by either Philipson or Jasgur (the "Purported Settlement"). (Philipson Ex. No. 11). Moreover, the Purported Settlement contains numerous conditions, which the parties may or may not have met. As such, the Court cannot interpret the Purported Settlement without further substantial evidence. However, the Court can conclude that the Purported Settlement, even if enforceable, did not *independently* transfer Jasgur's entire interest in the Jasgur

Collection to Philipson; nor did it reconvey any interest he may have had back to Jasgur.[11]  For purposes of this ruling only, the Court cannot find that the Purported Settlement is enforceable or that it altered Philipson's interest in the Jasgur Collection.

However, the documents filed with the United States Copyright Office do provide Philipson with at least an argument that he is a partial owner of a portion of the Jasgur Collection.  As part of the business of Prime Entertainment, in 1987 and 1988, Philipson applied for and received copyrights for specific photographs.  (Jasgur Ex. Nos. 15 and 16).  These photographs include many if not all of the early photos Jasgur took of Marilyn Monroe.  In accepting the registered copyright, the Copyright Office listed the joint copyright claimants as "Joseph Jasgur, Paul E. Philipson," with one exception, Copyright VAu-106-204, which listed only Joseph Jasgur as the copyright claimant. Therefore, it appears that Jasgur and Philipson may be joint claimants on these specific copyrighted photos.  However, it also appears that the parties only copyrighted a portion of the photos that are included in the Jasgur Collection, and, although these may be the most valuable portion of the collection, the copyrighted photos do not constitute the entire Jasgur Collection.    Moreover, in at least one case, Jasgur is the only copyright claimant.

As such, Philipson has failed to establish how the three business agreements, the Purported Settlement, or the copyright registration documents give him a 100 percent interest in the Jasgur Collection.  The Court concludes that he *may* have a claim to a portion of the collection but that he has failed to demonstrate a 100 percent ownership in the collection.  The Court also notes that Philipson has failed to take any action to assert any such claim for almost 20 years.  He did not offer any credible explanation why he has failed to take any action in two

---

[11] Philipson introduced an unsigned Assignment that was intended to be executed by Philipson when he was to re-convey any interest in the Jasgur Collection back to Jasgur. (Philipson Ex. No. 12).  Again, the introduced document was not signed and is not enforceable.

decades to recover these assets, if he truly believed he was the sole owner of the valuable Jasgur Collection. Accordingly, regardless of Jasgur's possible future dispute with Philipson over the extent of his claim, Jasgur clearly retained some interest in the Jasgur Collection that he subsequently could transfer to others, possibly to PITA.

### PITA's Interest in the Jasgur Collection

The issue then becomes, what, if anything, did PITA acquire from Jasgur. PITA bases its ownership claims in the Jasgur Collection on two grounds. First, in early 2000, PITA signed two agreements with Jasgur—a Purchase Agreement and an Exclusive Marketing Agreement— which PITA asserts gave it ownership rights in the Jasgur Collection. Second, in March 2000, PITA purchased items Jasgur had left in a rental unit located in California from Joseph Yaron, the owner of the unit.

To put these transfers in context, by 2000, Jasgur had married Debbie Van Neste and was living in her home in Florida. Jasgur had met Robert Fox, who made a business proposal involving PITA and the marketing of the Jasgur Collection. Eventually, two written agreements were signed.

The first agreement, titled a Purchase Agreement (the "Purchase Agreement"), was signed by PITA and Jasgur on January 6, 2000. (Jasgur Ex. No. 31). For $6,250, Jasgur agreed to sell ten sets of photos, each set containing 25 black and white 11 inch by 14 inch images of Marilyn Monroe. Jasgur also agreed to give PITA "twenty signed letters of authenticity." The sale contemplated only the transfer of copies of the photos and no ownership change insofar as Jasgur specifically required that the copyright for the photos "remain in the name of Joseph Jasgur." PITA promptly paid for these photos. (Jasgur Ex. Nos. 32 and 33). PITA hired a professional photocopier to reprint the photos, and no dispute exists that these photos were timely supplied by Jasgur. Further, nothing in this early agreement gave PITA any ownership or

intellectual property rights in the photos.[12]  Rather, the Purchase Agreement simply conveyed to PITA a small, defined group of photos and letters of authenticity.

The second agreement, the Exclusive Marketing Agreement (the "EMA") (Jasgur Ex. No. 35), contemplated a long term business relationship between Jasgur and PITA.  The purpose of the agreement was to give PITA the exclusive right to market and to sell the inventory as defined in the EMA.  However, some of the language in the EMA suggests that Jasgur may have intended to convey to PITA some portion of the Jasgur Collection beyond that already conveyed under the Purchase Agreement.

The EMA was signed on February 1, 2000, by Robert L. Fox, on behalf of PITA, and by Jasgur and his then-wife, Debbie Jasgur.  Some discussion of the EMA's language is necessary. In the preamble of the EMA, Jasgur represents that he is "the owner of certain photographic images and negatives"[13] that he wishes to market.  In turn, PITA represents that it has contacts with possible buyers.  As such, the parties agreed to form a joint venture "to market and sell the Inventory at a profit."

The EMA provided that Jasgur "contributes the Inventory to PITA, as the exclusive agent therefor." (Paragraph 2 of the EMA).  Jasgur also represented that he owned the Inventory free and clear of any encumbrances whatsoever. In turn, PITA agreed to "use its best efforts to market the Inventory to those persons or entities, whether public or private, that it deems most

---

[12] Fox testified that he paid an additional $1,000 to Jasgur to obtain negatives of the purchased photos.  Although Jasgur may have given Fox access to copies of the original negatives in order to allow Fox to develop high quality photos, the Court specifically finds that Fox's testimony is not credible.  Jasgur did not transfer and did not intend to transfer complete ownership of these photos together with any related intellectual property rights for the small sum of an additional $1,000. Rather, the Court finds that the payment of the additional $1,000 was to allow Fox to use copies of better quality negatives, nothing more.  The payment transferred no ownership rights.

[13] The EMA later defines the term "inventory" to "be a comprehensive term meaning the images owned by Jasgur in all their formats, whether positive or negative photographic images, digital, still, or video, internet or moving pictures or otherwise, it being the intent that the venture will have the exclusive rights to sell Jasgur's work product."  Obviously, the definition really does not delineate the items included, but appears to broadly include all of Jasgur's work.

likely to be interested in purchasing the Inventory." The net profits of the joint venture were to be divided with Jasgur receiving 30 percent and PITA receiving 70 percent.

The joint venture was contemplated to last until the Inventory was completely sold or until the year 2025, provided, however, that Jasgur was guaranteed a distribution of at least $100,000 in the first year or either party could cancel the agreement. The EMA further specified that previous prints provided to PITA by Jasgur would become assets of the joint venture and that all monies paid to Jasgur for the prints would be applied to the $100,000 distribution to Jasgur to occur in the first year under the EMA.[14]

The Court specifically finds that, unlike the Purchase Agreement, the EMA did not convey any physical assets beyond those already conveyed under the Purchase Agreement, which were subsumed by the EMA. Rather, as the very title of the EMA makes clear, the EMA simply gave PITA the exclusive right to market and to sell the Inventory for the benefit of the parties, and nothing more. More significantly, the EMA transferred no intellectual property rights or any other type of ownership interest in the Jasgur Collection to PITA.

Typical for Jasgur, the joint venture under the EMA did not go smoothly. PITA did start to market Jasgur's work. PITA located a gallery, and the photos were displayed in a very attractive way for the public to view. However, a dispute soon arose between Fox and Jasgur. One evening after a blow-up between them, Jasgur and his wife, Debbie, went to the gallery and removed every image. They refused to return the images or to supply any further work to PITA. Not surprisingly, litigation ensued.

Before pursuing this lawsuit, however, and separate and apart from what PITA acquired by way of the Purchase Agreement and EMA, PITA purchased items Jasgur had stored in a rental unit in California from Joseph Yaron, who owned the rental unit. Prior to 1998, Jasgur

---

[14] PITA received credit for the $7,250 already paid under the earlier Purchase Agreement.

had stored items at the unit but had not paid the rental bill for some time. (Deposition of Debra Van Neste, p. 12, line 1 – p.13 line 15, Africh Ex. No. 61). On July 21, 1998, Yaron instituted a state court unlawful detainer action, Case Number 98U16534, in the Los Angeles Superior Court, to regain possession of the storage unit.[15]    A three-day eviction notice was posted directing Jasgur to either pay the rent or quit the premises. (Africh Ex. No. 15). He did neither. Jasgur was served, but he did not respond to the complaint.

On September 3, 1998, the California state court entered a default judgment against Jasgur and granted Yaron a Writ of Possession to regain control over the unit and to dispose of the unit's contents.  Both a Notice to Vacate and a formal Notice of Eviction were posted on the premises providing that Jasgur's right to possess the premises "has been terminated.  Any property which you may have left upon the premises is now under the legal control of the judgment creditor [Yaron]."  (Africh Ex. Nos. 29 and 30).  Moreover, the local Sheriff's Department gave Yaron access to the premises at 7:14 a.m. on September 23, 1998.  The Sheriff's Receipt for Possession of Real Property (Africh Ex. No. 31) contained the following information on disposing of the remaining personal property:

> All personal property left on the premises has been turned over the property owner [Yaron].  The property owner may charge a reasonable storage fee for maintaining the property.  However, upon demand of the tenant, the property owner must return the tenant's property if the tenant pays all costs incurred by the property owner for storage and maintenance.  If the cost incurred by the property owner is not paid, or if the property left behind is not claimed before the end of the fifteen-day period, the property owner may either sell the property at a public sale and keep from the proceeds of the sale the costs of storage and of the sale, or if the property is valued at less than $300.00, the property owner may dispose of the property or retain it for his own use.

---

[15] A custodian for the records of the Los Angeles Superior Court testified that they routinely destroy these files one year after the Writ of Possession is entered, as reflected on the docket sheet.  (Africh Ex. Nos. 62 and 11).  However, she confirmed that a Writ of Possession indeed was entered.

Yaron did not immediately dispose of Jasgur's items stored in the unit. Rather, Yaron continued to call Jasgur to make arrangements for Jasgur to retrieve his property. Eventually, in early 2000, around the same time that PITA was still working collegially with Jasgur under the EMA, Jasgur told Fox about his problem and explained that he was about to lose the valuable personal property stored in Yaron's rental unit. Fox, believing the property indeed had value and was related to the items they were attempting to market under the EMA, immediately flew to California to buy the property from Yaron. Fox would have had no knowledge of the abandoned property, if Jasgur had not told him. Jasgur was fully aware of the purpose of Fox's trip. Indeed, Jasgur also traveled to California with Fox, specifically to assist him in negotiating a deal with Yaron.

Fox was successful in his negotiations. As President of PITA, Fox and Yaron signed a General Release, Settlement, and Purchase Agreement on March 17, 2000 (the "California Purchase and Release Agreement") (Africh Ex. No. 10). Under the California Purchase and Release Agreement, PITA agreed to buy the property left at the storage unit for $25,000. There is no exact list of the property PITA purchased in California, however, the items include negatives, photos, photographic equipment and other related paraphernalia (the "California Assets").

Jasgur was fully apprised of the terms of the sale and did not object. Further, as part of the exchange, Yaron gave both PITA and Jasgur full releases. Specifically, the California Purchase and Release Agreement provided that Yaron would "absolutely and unconditionally transfer, assign, convey, release, and deliver unto Pita, all of [Yaron's] right, title, and interest in and to the Property." Yaron thus released any claim he had to the California Assets, or against Jasgur for unpaid rent, in exchange for PITA's $25,000 payment. PITA promptly hired a moving van to transport 17,000 pounds of goods, according to Fox, from California to Florida.

Jasgur now complains that Yaron's sale of the California Assets to PITA was not properly conducted under California law. Section 1988 of the California Civil Code governs the disposition of personal property remaining on leased premises at the termination of a tenancy and provides that such property "shall be sold at public sale by competitive bidding." West's Ann.Cal.Civ.Code § 1988(a). Without question, no public sale was held in connection with the California Assets.

Nevertheless, for multiple reasons, Jasgur cannot now, seven years later, attack the validity of the sale and PITA's purchase of the California Assets on the basis that Yaron did not comply with Section 1988(a). Jasgur assisted PITA in its negotiations with Yaron and was fully aware of PITA's purchase of the California Assets from Yaron in March 2000. In exchange for the $25,000 PITA paid to Yaron, PITA and Jasgur both individually benefited. PITA received physical possession of the property. Jasgur got a complete release from Yaron for any liability to Yaron for unpaid rent or otherwise.

Jasgur cannot actively participate in the private sale and then later challenge the validity of the private sale. If Jasgur objected to the private sale, he should have voiced his objection at the time. He did not. Instead, he helped orchestrate and fully consented to the sale. In so doing, he has waived any right to assert this belated attack. Citizens of State of Florida v. Wilson, 571 So.2d 1300, 1302 (Fla. 1990) (Procedural irregularities may be waived by parties, who, knowing the irregularity, act without making any timely objection); Alaska Airlines v. U.S., 399 F.Supp. 906, 916 (N.D. Cal. 1975) (discussing waiver and consent, noting that waiver constitutes the abandonment of a right); Donegan v. City of Los Angeles, 109 Cal. App. 673, 293 P.912 (Cal. App. 3 Dist. 1930) (discussing estoppel by acquiescence, and concluding that landowners waived any right to complain regarding a condemnation action, which they knew was unauthorized, because they acquiesced by keeping a damage award for 13 years).

In addition, the equitable doctrine of laches also would bar Jasgur's claim. Under Florida law, laches may bar a claim where there has been "unreasonable delay in enforcing a right, coupled with a disadvantage to the person against whom the right is sought to be asserted." Peacock v. Firman, 177 So.2d 560, 562 (Fla App. 1965). ("The test in determining whether laches exists is whether the delay has resulted in injury, embarrassment, or disadvantage to any person, and particularly to the person against whom the relief is sought."). California law, to the extent it applies, similarly provides that laches may bar a claim if the complaining party knows of the prior act and voluntarily acquiesced in the other party's alleged wrongful acts:

> One of the principal factors in determining laches is acquiescence. * * * Acquiescence, to constitute laches, 'must be with the knowledge of the wrongful acts themselves and of their injurious consequences, it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal or moral necessity, and it must last an unreasonable length of time, so that it will be inequitable even to the wrong-doer to enforce the peculiar remedies of equity against him after he has been suffered to go on unmolested and his conduct apparently acquiesced in.'

Nelson v. Robinson, 47 Cal.App.2d 520, 531, 118 P.2d 350, 357 (Cal. App. 3 Dist. 1941) (quoting 10 Cal. Jur. pp. 528-529, § 66).

Applying the standard for laches set forth under the laws of either state, Florida or California, the doctrine would preclude Jasgur from arguing that Yaron's private sale of the California Assets to PITA was invalid at this late juncture. He participated in the sale. He did not object. More importantly, he clearly voluntarily acquiesced to the private sale, based upon a complete understanding of the terms of the sale, not due to any accident or mistake. It was not until years later, when Jasgur's newly appointed guardian wanted to regain control of the California Assets, that the guardian first challenged the validity of the sale. Such a belated objection cannot undo the transfer, whether under a theory of consent, waiver, or laches. As such, Jasgur cannot now be heard to complain about whether the sale was private or public.

PITA purchased the California Assets from Yaron on March 17, 2000. The sale is valid and is not subject to avoidance at this point. As such, PITA rightfully obtained possession of at least a portion of the Jasgur Collection, the California Assets. In addition, PITA obtained copies of photos under the Purchase Agreement, which it can sell. However, under the EMA, PITA obtained no intellectual property rights or other ownership interest in the remainder of the Jasgur Collection.

The only remaining issue is whether PITA obtained any enforceable claim against Jasgur or to the Jasgur Collection that arose under the EMA. PITA certainly asserted claims of this type on March 3, 2000, when PITA sued Jasgur in Florida state court to enforce the EMA[16] (the "Florida Litigation"). PITA asserted that Jasgur breached the EMA by failing to give PITA access to the inventory. (Africh Ex. No. 19). Jasgur promptly answered the complaint, raising several affirmative defenses.[17] (Jasgur Ex. No. 37, paragraphs 13 – 15).

After the Florida Litigation was filed, the situation became even more complicated. PITA transferred its interest in the Jasgur Collection (including all rights under the EMA and to the California Assets) to yet another party, Vintage Partners, Inc. The transfer is reflected in a document titled Asset Purchase Agreement (the "APA"), dated November 4, 2000. In the preamble to this, PITA reflects that it "owns or has the exclusive rights to sell the entire photographic works of Joseph Jasgur" and that PITA intended to assign its rights in the Florida Litigation, "except that any recovery from the lawsuit shall be divided between the parties in the same manner as net revenues are divided as provided in the Promissory Note and Net Revenue Distribution Agreement," attached to the APA. (Africh Ex. No. 21). Although complex, PITA

---

[16] The lawsuit was filed in Orange County, Florida, and is styled as <u>PITA Corporation vs. Joseph Jasgur and Debbie Jasgur</u>, Case No. CI 000-1642. The lawsuit was filed on March 3, 2000, <u>before</u> Fox had purchased the items from Yaron in California. The complaint was not served on Jasgur until after PITA obtained possession of the California assets.

[17] Jasgur also had filed an earlier answer, at that time acting <u>pro se</u>, in the Florida Litigation. (Jasgur Ex. No. 53).

agreed to sell to Vintage Partners all of its interest in the Florida Litigation, the California Assets, and the Jasgur Collection in exchange for a payment of $200,000 to a pawn shop,[18] any amounts that PITA ultimately had to pay Jasgur, and for a promissory note payable to PITA in the amount of $1.8 million, which would not accrue interest but was payable one year later, on November 4, 2001.

Vintage Partners granted PITA a security interest in the Jasgur Collection. Other than the California Assets and the copies of any photos provided under the Purchase Agreement, PITA did not have possession of any other significant portion of the Jasgur Collection. Therefore, this agreement obligates PITA to do the impossible—give Vintage Partners the Jasgur Collection, which largely was in the possession of Jasgur or others.

Based on its rights under the APA, Vintage Partners entered the fray of the Florida Litigation. They filed an Intervenor's Complaint also asking the court to enforce the EMA and to require Jasgur to turnover the Jasgur Collection.[19] Jasgur, in the meantime, went into a downward spiral. His attorney was no longer appearing on his behalf in the Florida Litigation, and Jasgur filed no answer to Vintage Partners' Intervenor's Complaint. Eventually, on May 16, 2002, the state court entered an order granting Vintage Partners' Motion for Entry of Default Final Judgment. (Jasgur Ex. No. 60).

In granting this motion, however, the state court did not enter a default judgment. Rather, the court held that "as to liability" the motion was granted. The court then directed the parties to schedule an evidentiary hearing to determine the "specific items in the Jasgur Collection for

---

[18] Vintage Partners agreed to pay $200,000 to Value Pawn and Jewelry Store, Inc, presumably for a liability Fox incurred in one of his other "investments."

[19] Vintage Partners asserted four counts in their Intervenor's Complaint: (1) Action for Specific Performance, seeking possession of the Jasgur Collection,; (2) Action for Breach of Agreement, seeking to enforce the EMA; (3) Action for Conversion, seeking a judgment that Jasgur improperly converted the Jasgur Collection; and (4) Action for Replevin, again seeking possession of the Jasgur Collection.

which relief is sought and the amount of damages sought."  The state court has never held any

further evidentiary hearing.  Therefore, although the parties in this bankruptcy forum continually

refer to this order as the "Default Judgment," the parties err.  The state court never entered any

judgment in favor of PITA or Vintage Partners, the Intervenor.   Moreover, other than arguably

precluding Jasgur from contesting liability on claims brought by Vintage Partners, no damages or

relief was ordered by the state court.

Typical with the other events involving PITA and Fox, PITA's relationship with Vintage

Partners also eventually soured.   PITA could not perform under the APA.  On January 15, 2003,

Vintage Collections, Inc. and PITA terminated the earlier APA between PITA and Vintage

Partners, Inc.[20]  The parties intended to return to the earlier status quo, with the only exception

being that PITA was to receive all rights held by Vintage Collections, Inc. in the Florida

Litigation.[21]

In this adversary proceeding, the issue is whether PITA, in addition to the California

Assets or copies of photos supplied under the Purchase Agreement, obtained any claims or

interests enforceable against Jasgur or the Jasgur Collection under the EMA as asserted in the

Florida Litigation.  Jasgur asserts PITA obtained nothing under these agreements because, at the

time these agreements were executed, PITA was a dissolved Texas corporation, unable to

conduct business, and is unable to enforce any legal rights arising from these agreements,

whether in this Court or in the Florida Litigation.

PITA was incorporated as a Domestic For-Profit Corporation in Texas on November 13,

1995.  (Jasgur Exh. No. 66).  PITA later allowed its corporate status to lapse.  According to the

---

[20] The Termination Agreement was signed by a representative of Vintage Partners, Inc.

[21] During the pending bankruptcy case, on March 31, 2003, on the virtual eve of the date the case was converted to a Chapter 7 case and a trustee appointed, PITA did attempt to transfer its rights in the Florida Litigation to Africh, pursuant to yet another Asset Purchase Agreement.  (Jasgur Ex. No. 48).  Africh filed a Stipulated Motion to Substitute Party Plaintiff in the Florida Litigation; however, the state court denied that request, "until such time as the bankruptcy court provides guidance."  (Jasgur Ex. Nos. 62 and 63).

records of the Texas Secretary of State, updated as recently as September 12, 2006, and just days before the trial of this adversary proceeding, PITA forfeited its charter and became "inactive" on February 12, 1999. (Jasgur Exh. No. 66). *After* PITA forfeited its charter, the company, through Fox, continued to operate and engaged in multiple transactions, including executing the Purchase Agreement, on January 6, 2000, the EMA, on February 1, 2000, purchasing the California Assets, on March 17, 2000, and entering into the APA with Vintage Partners, Inc., on November 4, 2000. The issue is whether PITA now has the ability to enforce any rights or assert any claims arising under these agreements under Texas corporation law.

A corporation's rights are governed by the laws of its state of incorporation. In re Air Safety Intern., L.C., 336 B.R. 843, 853 (S.D.Fla.2005) (a company's existence turns on state law) (citing Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp., 302 U.S. 120, 127, 58 S.Ct. 125, 128, 82 L.Ed. 147 (1937); In re Aurora Invs., Inc., 134 B.R. 982, 984 (Bankr.M.D.Fla.1991)); In re Bercu, 293 B.R. 806, 809-810 (Bankr. M.D. Fla. 2003) (right to sue is governed by state of incorporation) (citing In re ABZ Ins. Services, Inc., 245 B.R. 255 (Bankr.N.D.Tex.2000). Therefore, Texas law is applicable.

Under Texas law, a corporation who forfeits its charter is treated as a dissolved corporation. TEX. BUS. CORP. ACT ANN. art. 7.12F(1) (Vernon 2003). PITA was a Texas corporation who forfeited its charter on February 12, 1999. Therefore, PITA is and has been a dissolved Texas corporation for many years.

Article 7.12(A) also specifies the limited actions that a dissolved Texas corporation may take.[22]    For a period of three years from the date of dissolution, in PITA's case, from February 12, 1999, until approximately February 12, 2002, a dissolved corporation may (1) continue with pending litigation by or against the corporation; (2) address any existing claims by or against the corporation; (3) hold and liquidate any assets that remained with the dissolved corporation at the time of dissolution or that later were collected by the dissolved corporation; and (4) "settle any other affairs not completed before dissolution."    Article 7.12 represented the codification of the trust fund theory, under which "[c]reditors were not given unlimited access to the dissolved corporation's assets, rather, in the interest of orderly and final distribution of assets, the period of time during which a corporation could be sued was limited to three years." Martin v. Texas Woman's Hosp., Inc., 930 S.W.2d 717, 720 (Tex.App.-Houston [1 Dist.],1996).

The statute, however, expressly prohibits a dissolved corporation from engaging in new business transactions.[23]    Moreover, a dissolved corporation can only pursue litigation involving claims by or against the corporation that existed on the dissolution date during the three year wind-up, or grace, period.    An existing claim is defined as "a claim that existed *before* dissolution."  TEX. BUS. CORP. ACT ANN. art. 7.12(F)(3) (Vernon 2003).  Therefore, under Texas law, a corporation who forfeits its corporate charter is treated as a dissolved corporation and is allowed to wind-up its affairs but is not allowed to engage in any new business transactions.

---

[22] Specifically, Article 7.12A(1)-(4) provides: A dissolved corporation shall continue its corporate existence for a period of three years from the date of dissolution, for the following purposes:

(1)  prosecuting or defending in its corporate name any action or proceeding by or against the dissolved corporation;

(2)  permitting the survival of any existing claim by or against the dissolved corporation;

(3)   holding title to and liquidating any properties or assets that remained in the dissolved corporation at the time of, or are collected by the dissolved corporation after, dissolution, and applying or distributing those properties or assets, or the proceeds thereof, as provided in Subsections (3) and (4) of Section A of Article 6.04 of this Act; and

(4)  settling any other affairs not completed before dissolution.

[23] Specifically, the language provides that "a dissolved corporation may not continue its corporate existence for the purpose of continuing the business or affairs for which the dissolved corporation was organized." TEX. BUS. CORP. ACT ANN. art. 7.12 (Vernon 2003).

Of course, PITA did not adhere to the strictures of Texas law. Fox and PITA continued to enter into new business transactions, including those involving Jasgur and his photographs.[24] The next inquiry then is whether PITA retained any rights or claims as a result of these improper actions. The Court finds that it did not.

Two recent Texas appellate court decisions provide guidance: <u>Landrum v. Thunderbird Speedway, Inc.</u>, 97 S.W. 3d 756 (Tex.App.-Dallas, 2003) and <u>Emmett Properties, Inc. v. Halliburton Energy Services, Inc.</u>, 167 S.W.3d 365 (Tx.App.-Houston, 2005). In <u>Landrum</u>, Edgar Landrum, Sr. was killed in a tragic accident at a race track operated by Thunderbird Speedway, Inc. The accident occurred *after* Thunderbird had forfeited its corporate charter and was deemed a dissolved corporation. Because the claim of Mr. Landrum's family arose after this dissolution, the Texas appellate court determined that they did not have an "existing claim" that was valid on the dissolution date. As such, the court held that the Landrum family could not assert the claim against Thunderbird Speedway, Inc. The claim was forever barred.

The statutory definition of "existing claim" encompasses not only claims *against* a dissolved corporation but also those held *by* a dissolved corporation. Therefore, if Thunderbird Speedway had a claim against a vendor arising after the dissolution date, the company also could not sue the vendor for payment. Just as the Landrum family, a third party, cannot sue a dissolved corporation for a claim arising after the dissolution date, a dissolved corporation, such as PITA, cannot assert a claim arising after the dissolution date. Both types of claims are forever barred.

The public policy underlying this result is apparent. A corporation is a legal fiction that exists only as allowed by the applicable state law. A dissolved corporation is a mere ghost of a fully authorized corporation. In Texas, a dissolved corporation retains limited rights to wind-up

---

[24] In the APA, PITA represents that it "is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas or will take such action as is necessary to be in good standing and has all corporate power and authority necessary to enable it to own, lease, or otherwise hold its properties and assets and to carry on its business." (Article 3.1 of the APA, Africh Ex. No. 21). All of these representations were false.

its affairs during a three-year grace period.  The dissolved corporation may not and should not conduct any new business during this period.  However, if a dissolved corporation chooses to violate this obligation, the proper result is that the corporation loses any right to sue on any post-dissolution claims.  Further, even if a third party has a claim against an operating, but dissolved, corporation, such as in the <u>Landrum</u> decision, the Texas courts bar the claim against the dissolved corporation, even when the claim involved the loss of a man's life.  Certainly, the same court would bar mere contractual claims brought by or against a dissolved corporation.

Moreover, even if a claim existed on the dissolution date, the claim is barred if the dissolved corporation or the aggrieved party does not prosecute the claim within the three-year grace period.   In <u>Emmett Properties</u>, a landowner sued a neighboring landowner raising environmental pollution claims.  However, because the claimant was a dissolved corporation who waited over three years to file suit, the claims "were extinguished." <u>Emmett Properties</u>, 167 S.W.3d at 370; <u>Durham Clinic, P.A. v. Barrett</u>  107 S.W.3d 761, 763 (Tex.App.-Waco, 2003) (holding claim against dissolved corporation was barred under Article 7.12, Section C, because it was brought more than three years after the date of dissolution); <u>Dorney v. Henderson Clay Products, Inc.</u>, 838 S.W.2d 314, 316, n.4 (Tex.App.-Texarkana,1992).  In <u>Emmett</u>, the existing claims were forever extinguished, even though the claimant, the dissolved corporation, later took steps to reinstate its corporate status under Texas law.  The Texas Appellate Court held that "Emmett's subsequent reinstatement to active status does not revive the extinguished claims." <u>Id</u>.  Thus, claims that did not exist at the dissolution date (as PITA's claims here) or that were not timely filed during the three-year wind-up period are extinguished forever.  Subsequent reinstatement of a corporation does not revive these extinguished claims.

The effect of Texas' corporation law is to forever extinguish any claims PITA may arguably hold against Jasgur or anyone else, regardless of the underlying validity of the claims, if the claims arose after February 12, 1999.  Here, PITA entered into all of the relevant agreements,

the Purchase Agreement and EMA with Jasgur and the APA and Termination Agreement with Vintage Partners/Collections, Inc., after February 12, 1999. The claims did not exist on the date that PITA forfeited its charter and became a dissolved corporation. As such, the claims, whatever they were, are forever extinguished. PITA has no enforceable claims arising under the Purchase Agreement, the EMA, or the APA.

PITA's sole claim to the Jasgur Collection, therefore, rests on its physical possession of the California Assets and any photos PITA received under the Purchase Agreement. Article 7.12A(3) of the Texas Business Corporation Act allows a dissolved corporation to collect these assets after dissolution for liquidation. If the physical assets are not liquidated during the three-year wind-up period, the corporation's shareholders, here the debtor, Seminole Walls, Inc., or, now, its Chapter 7 trustee, must complete the liquidation. 11 U.S.C. § 704; In re Gallagher, 283 B.R. 342 (Bankr. M.D. Fla. 2002) (discussing trustee's responsibilities); In re Talbert, 268 B.R. 811 (Bankr. W.D. Mich. 2001) (trustee's duty is to collect and liquidate the interests possessed by the debtor and distribute the proceeds for the benefit of unsecured creditors); See also, Lowe v. Farm Credit Bank of Texas, 2 S.W.3d 293 (Tex.App.-San Antonio, 1999) (Beneficial title to dissolved corporation's assets rests in shareholders); El T. Mexican Restaurants, Inc. v. Bacon, 921 S.W. 2d 247 (Tex.App.-Houston.1st Dist., 1995).

In summary, PITA can only liquidate physical assets in its possession and cannot pursue any claim arising after February 12, 1999. The Court holds that the only portion of the Jasgur Collection which PITA or its later assignees, such as the Chapter 7 trustee or Africh, can assert any right to control is the California Assets and any photos transferred under the Purchase Agreement, nothing more. Any other rights or claims PITA ever held against Jasgur or the Jasgur Collection are forever extinguished.

## **The Trustee's Settlement Agreement with Jasgur is Rescinded**

The next issue is whether the trustee independently obtained any rights to the Jasgur Collection under her settlement agreement with Jasgur.  The trustee always has contended that the parties should settle the disputes over the Jasgur Collection, rather than litigate them.  Shortly after meeting Jasgur, she instructed her counsel to try to reach an agreement with Jasgur.  Apparently, Jasgur and the trustee got along famously, and she spent many hours listening to his stories and colorful past.  The Court specifically finds that the trustee entered into the settlement genuinely hoping the agreement would help Jasgur and give him a well-earned reward for his years of work.

On August 26, 2004, her attorney made a settlement offer to Jasgur's lawyer that reflected the trustee's desire to allow "Joe to be able to enjoy the limelight again and be able to share stories of his heydays as a celebrity photographer.  She also wants Joe to be able to enjoy and share in the monetary value of his Collection."  (Trustee Ex. No. 5).  In making this settlement offer, the trustee's lawyer stated that "Joe has had a default entered against him declaring that he has no rights in, at least, a portion of the Jasgur Collection.  Any interest Joe had currently rests with the Trustee." (Jasgur Ex. No. 3).  In response on September 28, 2004, Jasgur's lawyer, Richard Lee Barrett, rejected the settlement offer and specifically disputed the trustee's claim that she controlled the Florida Litigation, stating:

> The default judgment did not address ownership of the collection; it addressed only control over the collection and damages for withholding items from Vintage Partners, Inc. The EMA…was breeched [sic] almost immediately by Mr. Fox and PITA.  They thereby waived whatever interest they had in the collection.  PITA nevertheless sued Jasgur and Vintage intervened claiming they had purchased the collection from Fox and PITA for $1.8 million.  The default judgment was entered against the Jasgurs only on behalf of the intervener [sic] Vintage.  The judgment did not in any way address ownership of the collection or Fox and PITA's default of the Agreement.  More importantly, this default judgment was mooted when Vintage Partners backed out of

the deal and all of their money was returned to Fox/Pita. **We therefore respectfully disagree with your position that the default judgment confers any rights whatsoever upon the Trustee** except perhaps a right to prove and collect some unliquidated claim for Vintage's damages during the time It's [sic] contract was in force.

(Jasgur Ex. No. 4, emphasis added).  As this letter indicates, Jasgur was well aware of the Florida Litigation and its possible impact on any settlement with the trustee.

The negotiations between the trustee and Jasgur continued for months.  The parties and their lawyers exchanged numerous letters and e-mails tweaking the settlement, which was drafted primarily by the trustee's lawyers.  (See, e.g., Jasgur's Ex. No. 5, Trustee's Ex. Nos. 8, 9, 10, 11, 12, 13, 14, 15, 16, 17).  Multiple drafts of the settlement agreement were edited by the attorneys for both Jasgur and the trustee.  (See, e.g., Trustee's Ex. No. 18 and 19).  A settlement in principal was reached on December 13, 2004.  (Stipulation of Facts, Doc. No. 525, ¶ 14).  Eventually, on January 14, 2005, Jasgur and the trustee signed the agreement.  (Africh Ex. No. 63).  Notaries witnessed both parties signing the initial agreement.

The terms of the settlement are fairly simple, irrespective of the complicated negotiations that preceded its execution.  Jasgur was to turnover the Jasgur Collection to the trustee and work with her to market and to sell the items.  They would split the proceeds with Jasgur receiving 35 percent and the trustee the remaining 65 percent.   If settlements with other parties were needed, Jasgur and the trustee still would split the net revenue they received by the same percentages.   If any item was not sold in a timely fashion, the trustee would return it back to Jasgur.

The parties later noticed a few minor glitches in the initial settlement agreement.[25]  As such, on March 21, 2005, Jasgur and the trustee signed an Amended Settlement Agreement.  (Trustee's Ex. No. 41).   Jasgur signed the Amended Settlement Agreement in the offices of the

---

[25] The agreement was modified to correct certain typographical errors and to slightly alter the definition of the Jasgur Collection to delineate which photos were included in the "Hollywood Canteen" sub-section.

trustee's counsel before a notary.  His signature was witnessed by two objective witnesses.  Both Stanonik and Jasgur's counsel had knowledge of and assisted in getting Jasgur to the lawyer's offices to execute the Amended Settlement Agreement. (Trustee Ex. Nos. 38, 39, and 40). Indeed, Jasgur's lawyer directly participated in the discussion of who would make an appropriate witness and told Jasgur to "Execute away." (Trustee Ex. Nos. 36, 37, and 40).  The Amended Settlement Agreement made no material changes to the initial settlement.

The trustee filed a motion asking this Court to approve the settlement agreement on March 29, 2005.  (Trustee's Ex. No. 45 and Doc. No. 467 in the Main Case).  The trustee argued that the settlement was in the best interest of the bankruptcy estate for two reasons.  First, it would reduce the uncertainty of future litigation over who owns the Jasgur Collection.  Second, by gaining Jasgur's assistance, she could gather and sell the entire collection as one whole item, rather than in parts and, hopefully, generate a higher overall price.

As proponent of the proposed settlement, the trustee has the burden of establishing that the settlement is fair and equitable and should be approved by the court.  In re Kay, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998) (citing In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986), _cert. denied sub nom._, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986); In re Gallagher, 283 B.R. 342, 346 (Bankr.M.D.Fla.2002).  Courts have significant discretion to approve a settlement, and courts should not simply "rubberstamp" a trustee's settlement. Depoister v. Mary M. Holloway Found., 36 F.3d 582, 586 (7th Cir. 1994);  Rivercity v. Herpel (In re Jackson Brewing Co.), 624 F.2d 599, 602-603 (5th Cir. 1980);  In re Kay, 223 B.R.  at 819; In re Bicoastal Corp., 164 B.R. 1009, 1016 (Bankr.M.D.Fla.1993) (citing In re Charter Co., 72 B.R. 70 (Bankr.M.D.Fla. 1987)).

In determining whether a settlement is fair and equitable, a court must consider: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (iv) the paramount interests of the creditors and a proper deference to their reasonable views in the premises. In re Justice Oaks II, Ltd., 898 F.2d 1544, 1549 (11th Cir. 1990), cert. denied, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990).  A court further must balance the settlement terms with the "likely rewards of litigation." Jackson Brewing Co., 624 F.2d at 602.

In this case, the trustee's settlement with Jasgur is fair and equitable.  Given the complexity of the competing positions of the various parties all asserting claims for control of the Jasgur Collection, it is clear that the litigation is difficult and the probability of success is questionable.  Indeed, the parties needed three days just to demonstrate that PITA had an interest, of some sort, in the Jasgur Collection.  The issues are anything but straight-forward.  Success certainly was not guaranteed and was not even predictable.  Collection efforts also would improve substantially if Jasgur and the trustee worked together, rather than in opposition to the other.  Moreover, the litigation is fact-intensive and raises numerous intellectual property and other legal issues.  The overall complexity coupled with the uncertainty of future litigation with the remaining defendants makes settlement between Jasgur and the trustee a pragmatic solution.  By entering into the settlement, the trustee not only attempted to avoid the expense, inconvenience, and uncertainty of  litigation, but also to spotlight Jasgur in a way that permitted him to enjoy some celebrity for his impressive body of work.

The certainty of a settlement also is in the paramount interests of the creditors.  However, Africh objected to the settlement contending that it owned all or a substantial portion of the Jasgur Collection and that the trustee lacks the authority to control the sale of the assets  (Doc. No. 484 in the Main Case). The Court agrees that the trustee, at this time, lacks control of the entire Jasgur Collection, as does Jasgur. Indeed, after entry of this ruling, the trustee's claim to the Jasgur Collection is very limited, and creditors later may regret not supporting this settlement earlier.

However, the Amended Settlement Agreement is between only two parties—Jasgur and the trustee.  The settlement provides that, to the extent Jasgur *or* the trustee gain access and legal title to the items in the Jasgur Collection, then, and only then, will the assets be sold and the proceeds divided 65/35 percent between them.  As such, the agreement is primarily to resolve the ownership issues between the trustee and Jasgur, no one else.  The settlement does not address the ownership claims of Africh or modify any claim any other third party may have to the Jasgur Collection.  All creditors need not consent to a settlement in order for it to be approved.  In re Winn-Dixie Stores, Inc., 356 B.R. 239, 249 (Bankr.M.D.Fla.2006).  The Court would easily find the settlement is in the best interest of all creditors, including Philipson and Africh, and overrules their objections.[26]

Therefore, all of the Justice Oaks factors support approval of the settlement.  It is fair and equitable, and, in a normal case, the Court would approve the settlement.  However, this case is anything but ordinary, because now, Jasgur himself seeks to rescind the agreement.

Jasgur contends he is not bound by his agreement with the trustee making three arguments.  First, Jasgur contends that *either* party to an agreement unilaterally can rescind a settlement with a bankruptcy trustee, up until the time the bankruptcy court approves the agreement.  Second, if he cannot unilaterally rescind the agreement, Jasgur next contends he was incompetent at the time he signed the agreement, which makes the settlement void and unenforceable.  Third, even if Jasgur was deemed competent to sign the agreement and he cannot unilaterally rescind the agreement, Jasgur argues he signed the agreement with a mistaken understanding, due either to a mutual mistake or to a negligent misrepresentation.

---

[26] Philipson also informally objected to a lack of notice regarding the terms of the trustee's settlement with Jasgur. The Court overrules this objection finding that both Philipson, individually, and his attorney, Joel Goldman, participated in a hearing in this case as early as March 30, 2005.  (Doc. No. 470 in the Main Case).  At this hearing, the trustee's motion to approve her settlement already was filed and was discussed during the hearing.  As such, Philipson had over one year to familiarize himself with the terms of the proposed settlement before the final hearing commenced on September 13, 2006.

As to Jasgur's first contention, he asserts he can unilaterally rescind the settlement agreement because the bankruptcy court has not yet approved the agreement, as required by Federal Rule of Bankruptcy Procedure 9019.[27]  In Chapter 7 liquidation cases, such as this one, bankruptcy courts frequently review settlement agreements reached by Chapter 7 trustees with interested parties.  Notice is given to creditors, and, if there is no objection filed, a hearing often is not needed.  Here, however, Africh objected to the settlement.

At the initial hearing to consider the settlement, it was obvious that the parties would present very similar evidence at both the trial on the issues raised in the pending adversary proceedings and in connection with the approval of the settlement.  Because of the anticipated similarity of evidence, which was confirmed during the actual trial, the Court consolidated the issues regarding whether the settlement was fair and equitable with the trial of this adversary proceeding.  As such, there was a considerable delay, over one year, between the date the trustee filed her motion to approve the settlement agreement and the date the trial of this adversary proceeding commenced.  It was during this interim period that Jasgur's newly appointed guardian decided to seek the rescission of the settlement.

The Bankruptcy Code does not specifically address whether parties are bound to a settlement agreement in a Chapter 7 liquidation case, pending bankruptcy court approval.  Nor has the Eleventh Circuit Court of Appeals directly addressed the question of whether a settlement agreement is binding between the parties pending court approval.  In <u>Cotton v. Bank South</u>, 992 F.2d 311 (11th Cir. 1993), the Eleventh Circuit Court of Appeals considered whether a debtor to a settlement agreement must comply with the terms of the settlement he reached with his creditor

---

[27] Bankruptcy Rule of Procedure 9019 merely provides that parties are entitled to appropriate "notice and hearing" prior to approval of a compromise by a bankruptcy court. Rule 9019 provides:  (a) Compromise.  On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.  Fed.R.Bankr.P. 9019(a).

before he could dismiss his Chapter 12 case. In that case, the court allowed the debtor to dismiss the case, without first honoring the terms of the settlement. In the ruling, the Eleventh Circuit Court of Appeals did not discuss the binding nature of settlement agreements, pending court approval, but instead relied on the debtor's absolute right to dismiss a Chapter 12 case. The court held that, absent fraud, a court does not have discretion to interfere with a Chapter 12 debtor's right to dismiss the case pursuant to Section 1208(b) of the Bankruptcy Code and reversed the lower courts that enforced the terms of the settlement agreement as a condition precedent to dismissal. However, one can infer from the decision that the settlement agreement was not binding pending court approval. Certainly, the settlement did not stop the debtor from dismissing his case and avoiding the impact of the debtor's agreement with his creditor.

Other courts, probably the majority, throughout the country similarly have concluded that settlements in bankruptcy cases are *not* binding on the parties until bankruptcy court approval is obtained. In re Blehm Land & Cattle Co., 859 F.2d 137 (10th Cir. 1988); In re Glickman, Berkovitz, Levinson & Weiner, 204 B.R. 450 (E.D.Pa. 1997); In re Masters, Inc., 149 B.R. 289 (E.D.N.Y. 1992); Reynolds v. Commission of Internal Revenue, 861 F.2d 469 (6th Cir. 1988); In re Rothwell, 159 B.R. 374 (Bankr. D.Mass. 1993); In re Nationwide Sports Dist., Inc., 227 B.R. 455 (Bankr. E.D.Pa. 1998); In re Bramham, 38 B.R. 459 (Bankr. D.Nev. 1984); In re Cincinnati Microwave, Inc., 210 B.R. 130 (Bankr.S.D.Ohio 1997) (until it has been approved by a bankruptcy court, a settlement is not enforceable).

Other courts have disagreed, holding that parties are bound by settlement agreements upon execution and prior to obtaining bankruptcy court approval. In re Tidewater Group, Inc., 8 B.R. 930 (Bankr.Ga.1981); In re Frye, 216 B.R. 166, 173 (Bankr.E.D.Va.1997) (holding it inequitable to allow a party to an otherwise enforceable compromise pending a properly noticed and scheduled hearing to revoke an offer after it had been accepted merely because the court had not yet heard the motion); In re Paolino, 78 B.R. 85, 89 (Bankr.E.D.Pa.1987) (holding settlement

agreement binding despite claims of mutual mistake or duress where agreement was read into record, parties testified to its accuracy, debtor understood import of proceedings given his sophistication and presence of counsel).

Within the Eleventh Circuit and the Middle District of Florida, courts generally have adopted the majority view that settlement agreements are not enforceable between the parties prior to approval by the bankruptcy court. In re Tarrant, 349 B.R. 870 (Bankr.N.D.Ala.2006) (compromise has no effect until approved by a bankruptcy court); In re Degenaars, 261 B.R. 316 (Bankr.M.D.Fla.2001); *but see* In re Harrell, 351 B.R. 221 (Bankr.M.D.Fla. 2006) (upon signing by both parties, a valid and binding contract was formed, subject only to compliance with a stated condition precedent to a contract).

Both sides of this issue have strong public policy arguments. Courts that do *not* require prior court approval before enforcing settlement agreements focus on the sanctity of a person's promise. By entering into the settlement, these courts require the welching party to live up to their agreement, regardless of whether court approval is obtained or not.

On the other hand, those courts that delay enforcing settlement agreements until a court has reviewed and approved the terms of a settlement focus on the bankruptcy process and the need for creditors to stay informed. A rule requiring court approval first "prevents debtors from entering into secret agreements and safeguards the rights of creditors who otherwise might be harmed by providing them with an opportunity to object to the proposed settlement if they find it unsatisfactory." Columbia Gulf Transmission Co. v. Louisiana Natural Gas Pipeline, Inc., No. 93-239, 1994 WL 693361, at *3 (E.D.La. Dec. 9, 1994) (unreported), citing In re Masters, 149 B.R. 289, 291-292 (E.D.N.Y. 1992); In re Rothwell, 159 B.R. 374, 378 (Bankr.Ct. D.Mass., 1993).    Requiring creditor notice and court approval also allows the bankruptcy court to consider whether the agreement maximizes the recovery to the creditors in the estate or, instead, rewards just one creditor or the debtor at the expense of all others.

All in all, this Court finds these latter arguments compelling. A clear, bright line rule making settlement agreements effective only upon court approval lessens the risk that one party will start to perform and then the other party reap the benefits but rescind the agreement. A bright line rule also will encourage parties to obtain approval for the settlement agreement, so that both sides will get the benefit of their bargain, assuming the agreement is fair and equitable and in the best interest of the bankruptcy estate.

Accordingly, the Court concludes that either party to a settlement agreement with a Chapter 7 trustee can rescind the agreement, until such time as the bankruptcy court approves the settlement. At that point, and only at that point, the settlement becomes enforceable against both parties. Here, Jasgur sought to rescind the agreement with the Chapter 7 trustee prior to approval by this Court. Therefore, Jasgur may rescind his agreement with the trustee.

For purposes of completeness, however, the Court will address Jasgur's other two arguments relating to the enforceability of the settlement agreement. Stanonik, Jasgur's guardian, asserts that Jasgur was not competent to sign the settlement agreement with the trustee on January 14, 2005, or to sign the amended version on March 21, 2005. There is no issue that Jasgur was declared mentally incompetent on August 10, 2005, that he is elderly, age 87 at the trial date, or that he recently was diagnosed with some serious medical conditions. (Jasgur Ex. Nos. 12 and 13). Jasgur was placed into a nursing facility after he broke his hip on December 2, 2005. (Jasgur Ex. No. 9). During his stay, the treating physician, Dr. Son L. Chau, issued his diagnosis, dated January 23, 2006, that Jasgur suffered from "hypertension, hyperlipidemia, cardiomegaly, remote history of prostate [sic] cancer, *a stroke in March 2005*, and Alzheimer's Type dementia." (Jasgur Ex. No. 8) (emphasis added). However, other than Dr. Chau's reference to a stroke in March 2005, there is no evidence or even implication that Jasgur was not competent to sign the Amended Settlement Agreement.

Of course, Dr. Chau was not treating Jasgur from January through March 2005, and his reference to a stroke was not based on personal knowledge.  Moreover, the date of the alleged stroke appears incorrect.   Rather, the evidence suggests that, on January 2, 2005, Jasgur was briefly admitted to Orlando Regional Hospital for a possible "small-mini-stroke." (Jasgur's Ex. No. 11).   One of Jasgur's acquaintances, Terry Mogavero, took him to the hospital because, during a telephone conversation, Jasgur was having some difficulty speaking. (Jasgur Ex. No. 67, p. 9).  Ms. Mogavero also drove Jasgur home after he was released from the hospital on January 5, 2005.  Jasgur was given a prescription for some expensive medication and was asked to return for a check-up and further tests in two months.   Certainly, Ms. Mogavero noticed a change in Jasgur's behavior after his hospital visit; however, Jasgur returned to his apartment, continued to live alone, and appeared to resume his old life.

Determining a person's current mental capacity is difficult; however, determining a person's capacity *retroactively* is nearly impossible.   To avoid a contract by reason of incompetency, there must be a showing that the party seeking to do so lacked the mental capacity to enter into a contract at the time of the transaction.  Parks v. Harden, 130 So.2d 626 (Fla.App. 1961).   It is the capacity of the individual at the time of execution that is controlling and subsequent incapacity will not affect the contract.  Id. (citing Gruber v. Cobey, 152 Fla. 591, 12 So.2d 461 (Fla. 1943)).  The burden of proof of incompetency is on the party alleging it by a preponderance of the evidence.  Travis v. Travis, 81 Fla. 309, 319, 87 So. 762 (Fla. 1921); Tyler v. Tyler, 108 So.2d 312 (Fla.App.1959); Parks, 130 So.2d at 628.

Mere weakness of mind is insufficient to set aside an agreement if the person had sufficient intelligence to understand the transaction and act upon his own free will.  Travis, 81 Fla. at 311-312; Donnelly v. Mann, 68 So.2d 584 (Fla. 1953); Parks, 130 So.2d at 628.  Feebleness of body does not create a presumption of incompetence nor authorize a court to set aside a contract.  Murrey v. Barnett Nat. Bank of Jacksonville, 74 So.2d 647 (Fla. 1954) (even a

lunatic may make a contract at a lucid interval); <u>Raimi v. Furlong</u>, 702 So.2d 1273 (Fla.3rd Dist.Ct.App. 1997).

This is particularly true in a situation such as this where Jasgur never led a conventional life.  Jasgur made odd business deals, lived in filth, never had any money, and was always searching for someone to whom he could tell a new story or yarn to about his glory days in Hollywood.  He was always on the brink of success and lived in a dream world that his early pictures of Marilyn Monroe would someday bring him the riches he believed himself due.  He never demonstrated the ability to handle the everyday stresses of life—getting his groceries, paying his bills, storing his work, or hiring people to help him.  Jasgur had operated that way for 50 years, and nothing really changed after the possible mini-stroke in January 2005, except he may have been a little more forgetful.  As Jasgur's former wife, Debra Van Neste, described her life with Jasgur:

> It was constantly drama.  He constantly got involved with people that were very unsavory.  Anybody that would talk to him, would become his new manager.  I constantly had to clean house of his mistakes.  He picked up some guy, a crack head, once and decided that he was going to be his manager….He was always looking for the next big thing and somebody to take care of him.

(Deposition of Debra Van Neste, p. 9, lines 2 – 17, Africh Ex. No. 61).  No medical or testimonial evidence in the record establishes that Jasgur was any less competent on January 12, 2005, than he was one year earlier, or, for that matter, ten years earlier.

Moreover, those closest to Jasgur acted the same way with him both before and after the possible mini-stroke.  Jasgur was represented by very capable counsel at the time he signed the two settlement documents in January and March 2005.   The settlement was heavily negotiated over several months by the lawyers.  Small details were revised and amended.   The attorneys believed the settlement was fair, and by their own correspondence, indicated that Jasgur supported the agreement in late March 2005. (Trustee's Ex. No. 40).   If they had any

contemporaneous belief that Jasgur could not understand the terms of the settlement, or if they thought he was not competent to sign the agreement, the Court is confident that counsel of this caliber would not have allowed Jasgur to sign the agreement.  Rather than prevent Jasgur from going forward, they supported him.

At the time the settlement was executed, Jasgur and his lawyers had kept Stanonik apprised of the terms of the agreement.  (Trustee's Ex. Nos. 69, 70 and 73).  Stanonik actively participated in the negotiation of the agreement, offering specific comments to include in the final version.  (Trustee's Ex. Nos. 71 and 72).  Most significantly, on January 4, 2005, around the time of Jasgur's alleged stroke, Stanonik confirmed that Jasgur was "ambulatory and lucid and at home."  (Trustee's Ex. No. 75).  In the very same e-mail, Stanonik went on to offer various final suggestions to the terms of the settlement.  Obviously, Stanonik, at almost the exact date the settlement was signed, believed Jasgur was competent to sign the agreement and believed the agreement was in his best interest.

In addition, the circumstances surrounding the execution of the settlement documents, both in January and March, also indicate that Jasgur was competent to sign the agreement. During this period, an acquaintance, Tom Endre, was very helpful to Jasgur.  He visited Jasgur frequently, drove him to meetings, and ran errands for him.  Endre also helped relay numerous messages and communications from Jasgur's attorneys to Jasgur about the settlement and was familiar with the terms of the settlement.  He also witnessed Jasgur signing the original and amended settlement agreements.  Uniquely, Endre was one of the few witnesses who had no financial involvement with Jasgur or his photographs and had nothing to gain or lose by his testimony.

In January, the trustee's counsel gave Endre a copy of the final version of the proposed settlement agreement.  Endre went to Jasgur's apartment, and then drove Jasgur to the office of a nearby notary.  Jasgur signed the settlement agreement before the notary on January 14, 2005.

None of those present, neither the notary nor Endre, expressed any concern that Jasgur was acting oddly or appeared confused. All testimony supports a conclusion that Jasgur knew what he was signing and understood his actions on January 14, 2005. The same is true when he executed the amended settlement agreement at the building where the trustee's lawyers work. None of the witnesses to the execution of Jasgur's signature, which again included Endre, expressed any concern about his mental capacity. Indeed, Endre's testimony was that Jasgur asked questions about the terms of the agreement, understood the settlement, and definitely understood he was signing a legal compromise.

In summary, no credible medical evidence supports a finding of Jasgur's incapacity in January through March 2005. His lawyers and friends treated him the same before and after the possible mini-stroke, recognizing that Jasgur always was a somewhat difficult and odd fellow. Moreover, nothing surrounding the execution of the settlement documents indicates that he did not understand what he was signing. As such, the Court concludes that Jasgur was mentally competent at the time he signed the original settlement agreement on January 14, 2005, as well as when he signed the amended agreement on March 21, 2005. Absent his unilateral decision to rescind the agreement, the Court would not otherwise relieve Jasgur of his obligations under the settlement agreement due to mental incapacity.

Lastly, Jasgur argues that he can rescind the settlement agreement because he signed it with a mistaken idea, either due to a mutual mistake he shared with the trustee or due to a negligent misrepresentation made by the trustee. Certainly, settlements are subject to rescission when the parties entered into the agreements under some material mistaken assumptions. However, that is not the case here.

Courts follow normal contract interpretation rules when they interpret settlement agreements. Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla. 1985); In re Sure-Snap Corp., 91 B.R. 178 (Bankr.S.D.Fla.1988). Following these rules, rescission of a contract is an adequate

remedy where the parties to the contract labor under a mutual mistake, which is material to the transaction. Mar-Char Enter., Inc. v. Charlie's The Lakes Restaurant, Inc., 451 So.2d 930 (Fla. 3rd Dist.Ct.App.), *review denied*, 461 So.2d 113 (Fla. 1984). A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument. Circle Mortgage Corp. v. Kline, 645 So.2d 75, 78 (Fla. 4th Dist.Ct.App. 1994). Mutual mistakes must be proven by clear and convincing evidence. Resort of Indian Spring, Inc. v. Indian Spring Country Club, Inc., 747 So.2d 974, 976-77 (Fla. 4th Dist.Ct.App. 1999).

Similarly, a settlement agreement is subject to rescission when one party negligently misrepresents a material fact and the other party, relying on the misrepresentation, is damaged. A party seeking rescission of an agreement for negligent misrepresentation must prove these elements: (i) the misrepresentation of material fact; (ii) the party making the statement must know of the misrepresentation, make the representation without knowledge as to its truth or falsity, or make the representation under the circumstances in which he *ought* to have known of its falsity; (iii) the party making the statement must intend that the representation induce another to act on it; and (iv) injury must result to the party in justifiable reliance on the misrepresentation. Baggett v. Electricians Local 915 Credit Union, 620 So.2d 784, 785 (Fla. 2d Dist.Ct.App. 1993); see also Wallerstein v. Hospital Corp. of America, 573 So.2d 9, 9 (Fla. 4th Dist.Ct.App. 1990); Fote v. Reitano, 46 So.2d 891 (Fla. 1950).

Jasgur relies on two basic aspects of this case to argue that his settlement agreement with the trustee should be rescinded due to some mistake or misstatement of fact. First, Jasgur contends that the trustee's attorneys overstated the bankruptcy estate's interest in the Florida Litigation. Specifically, Jasgur contends that the trustee represented she controlled the so-called default judgment, and, therefore, the claims raised against Jasgur in the Florida Litigation.

Second, Jasgur contends that the trustee failed to fully disclose interests other third parties, such as Philipson, may have in the Jasgur Collection.

Addressing first the issues in the Florida Litigation, the trustee's counsel did state, in her initial settlement offer, that "Joe has had a default entered against him declaring that he has no rights in, at least, a portion of the Jasgur Collection. Any interest Joe had currently rests with the Trustee." (Jasgur Ex. No. 3). The statement was enmeshed in a lengthy letter containing many other representations and proposals.

Jasgur's attorneys reviewed the letter carefully and promptly sent a lengthy reply. (Jasgur Ex. No. 4). One of the key responses was that Jasgur's attorneys challenged the trustee regarding her interest in the Florida Litigation, stating "We therefore respectfully disagree with your position that the default judgment confers any rights whatsoever upon the Trustee." Although the Court agrees with the reasoning in Jasgur's letter that the illusory default judgment has little impact, the import of this statement is that Jasgur never relied on the trustee's representations regarding her ability to pursue the state court order.

In addition, any reliance on the trustee's representation was not justified. The order granting Vintage Partner's Motion for Default Judgment was entered by a Florida state court and is maintained in the state's public records. Parties engaging in settlement discussions have an obligation to complete a reasonable amount of due diligence prior to entering into any agreement. Certainly, in this case, a legal review of the pending Florida Litigation was the bare minimum Jasgur's attorneys needed to complete, prior to signing the settlement agreement. The Court finds they had ample time to complete this investigation and, in fact, did a very thorough review of the pending state court action. To now say that Jasgur justifiably relied upon this sole representation made by the trustee's counsel or that it was material in his decision to proceed with the settlement is disingenuous and inconsistent with the lengthy negotiations between the parties on the terms of the settlement and the letters written by Jasgur's attorneys. Jasgur knew

that the trustee's ability to pursue any further relief against Jasgur in the Florida Litigation was "iffy," by their own statements. There was no scrivener's error. Certainly, there was no mutual mistake or any type of negligent misrepresentation by the trustee's counsel.

Nor did the trustee fail to disclose the identity of known third parties who may have an interest in the Jasgur Collection. Indeed, the trustee filed Adversary Proceeding 04-77 seeking a declaratory judgment against any party who she knew may have an interest in the Jasgur Collection. At the time Jasgur initially executed the settlement agreement, the trustee had limited or no knowledge that Philipson may assert a claim.

However, Jasgur, as a defendant in this adversary proceeding, knew of Philipson's claims. If *anyone* had any actual knowledge of who may claim an interest in the Jasgur Collection, it was Mr. Jasgur, himself. Jasgur was the gentleman who kept giving people pieces of his collection and then changing his mind. How can Jasgur now claim the trustee misled him when it was Jasgur who originally affected these multiple transfers and signed the related documents transferring intellectual property rights or copyright interests?

Jasgur's counsel also was keenly aware of the many competing interests in Jasgur's assets and that disputed copyrights existed. He acknowledged that copyright interests were germane to the settlement issues, as reflected in his letter of September 28, 2004, referencing intellectual property issues in connection with the parties' settlement discussions.[28] (Jasgur Ex. No. 4). Philipson's copyright interests were known by Jasgur, recorded in public records, and

---

[28] Paragraph 1 of the Proposal reads in pertinent part:

> …we disagree that items such as cameras, model release forms, copyrights, trademarks, and "other general intangibles" should be treated under our settlement the same as the images covered under the original Pita Agreement.

Jasgur Ex. No. 4 p. 3

Paragraph 7 of the Proposal reads in pertinent part:

> We agree however, we want to make clear that even if the copyrights and release forms are sold at auction, Joe will retain the rights to reproduce and/or liquidate whatever items are returned to him. . .

Id. p. 4.

readily accessible to both parties.  If indeed competing copyright interests were material to entering into a settlement agreement, Jasgur's counsel could have and should have completed a copyright search.  He cannot blame the trustee for his failure.

Neither the trustee nor Jasgur were acting under any type of mutual mistake when the settlement agreement was signed.  They both knew many people asserted a competing interest in the Jasgur Collection and that intellectual property issues were involved.  Moreover, the trustee never made any type of misrepresentation about the complexity of resolving these disputes.

Therefore, the Court concludes that Jasgur did not sign the settlement agreement under any type of delusion, whether it was due to incapacity, to a mutual mistake, or to a negligent misrepresentation by the trustee.   Indeed, the Court specifically finds that neither the trustee nor her counsel made any type of misrepresentation.  At most, the trustee expressed an opinion, which is not a ground for rescission.  <u>Malt v. Deese</u>, 399 So.2d 41 (Fla. 4th Dist.Ct.App. 1981).  As such, the settlement agreement is not subject to rescission under any theory of mutual mistake or negligent misrepresentation.

### <u>Conclusion</u>

After all of this analysis, answering the two issues resolved in the bifurcated trial is anti-climatic.  As to PITA's interest in the Jasgur Collection, PITA does hold an interest in the Jasgur Collection limited to the physical assets it bought from Yaron—the California Assets—and any photos copied under the Purchase Agreement.  Otherwise, PITA, as a dissolved Texas corporation, and its assignees have no enforceable claim against Jasgur or to the remainder of the Jasgur Collection.  As to Jasgur's ability to rescind his settlement agreement with the trustee, he can unilaterally rescind the agreement because the Court had not previously approved the agreement, but not due to any mental incapacity, mutual mistake, or negligent misrepresentation made by the trustee.

Separate orders consistent with this Memorandum Opinion will be entered.  In addition, a pretrial conference is set for **April 26, 2007, at 10:00 a.m.**, to consider the remaining issues raised in these consolidated adversary proceedings.

DONE AND ORDERED in Orlando, Florida, on the 2nd day of April, 2007.

_cxc_

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Debtor:  Seminole Walls & Ceilings Corp., 333 E. Landstreet Road, Orlando, FL  32824

Debtor's Counsel:  Frank M. Wolff, 1851 West Colonial Drive, Orlando, FL  32804

Trustee:  Carla Musselman, 1619 Druid Road, Maitland, FL  32751

Trustee's Counsel:  Bradley M. Saxton, Jennifer A. Jones, P.O. Box 1391, Orlando, FL  32802-1391

Africh Defendant's Counsel:  Roy S. Kobert, 390 North Orange Avenue, Suite 1100, Orlando, FL  32801

Defendant Jasgur's Counsel:  Elizabeth A. Green, Esquire, 390 N. Orange Avenue, Suite 600, Orlando, FL  32801

Tucker Byrd, Esquire, 450 S. Orange Avenue, Suite 650, Orlando, FL  32801-3311

United States Trustee, 135 W. Central Blvd., Suite 610, Orlando, FL  32801